IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 10–cv–02306–WJM–KMT

RK MECHANICAL, INC., a Colorado corporation,

      Plaintiff,

v.

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut
corporation,

      Defendant.

---

### ORDER

---

      This matter is before the court on cross motions for summary judgment by Plaintiff RK

Mechanical, Inc. ("RK") (Doc. No. 22 ["RK Mot.]) and Defendant Travelers Property Casualty

Company of America ("Travelers") (Doc. No. 21 ["Travelers Mot."]) filed April 15, 2011 and

the parties' consent to magistrate jurisdiction for purposes of deciding the cross motions for

summary judgment pursuant to 28 U.S.C. § 636(c)(1) (Doc. Nos. 18 & 19).

### STATEMENT OF THE CASE

      This breach of contract and declaratory judgment action arises out of an insurance

coverage dispute involving a builders' risk policy for a residential construction project.  The

following facts are undisputed for purposes of the present motions.  (*See* Doc. No. 17,

Stipulation of Counsel of Undisputed Facts for Use with Cross-Motions for Summary Judgment

("Stipulation"); RK Mot. ¶¶ 1-8, 11; Doc. No. 25, Defendant's Response to Plaintiff's Motion for Summary Judgment ("Travelers Resp.") ¶¶ 1-8, 11.)  On April 23, 2007, Travelers issued Commercial Inland Marine Policy No. QT-660-9469B749-TIL-07 (Compl. Ex. A-1) ("the Policy") to Spire Denver, LLC (Spire) for a residential construction project called "The Spire Denver" ("the Project").  The policy period was April 23, 2007 through July 23, 2009.  J.E. Dunn Rocky Mountain, Inc. ("Dunn") was the general contractor on the Project.  On May 24, 2007, Dunn entered into a subcontract with RK pursuant to which RK was to install heating, plumbing, ventilating and air conditioning systems at the Project.  The parties agree RK was an additional insured under the Policy.

As part of RK's plumbing work on the Project, RK installed approximately one hundred seventy-one CPVC flanges, which were manufactured by Charlotte Pipe and Foundry Company (the Charlotte flanges).  On June 16, 2009, two of the Charlotte flanges located in the Project's upper floor mechanical room cracked (the Flange Failure).  Water overflowed, either from a burst pipe caused by a defective flange or directly from one of the cracked flanges, resulting in water damage to the Project.  On June 17, 2009, Dunn notified Travelers of the Flange Failure and the ensuing water damage caused by the Charlotte flanges involved.  RK responded to the Flange Failure and water damage by removing and replacing the two cracked flanges and engaging in water remediation.  Travelers paid Dunn and RK for the costs associated with the water damage associated with the Flange Failure.[1]

---

[1] RK claims that Traveler's paid RK and Dunn for replacing the two cracked flanges which were the cause of the water damage.  As noted in the Analysis, Section A, Travelers

Following the Flange Failure RK examined all the remaining Charlotte flanges installed at the Project.  RK discovered that many of the flanges were cracked and showed signs of potential failure so RK proceeded to remove and replace the cracked flanges with new Charlotte flanges.  RK continued to monitor both the new and old Charlotte flanges and ultimately determined that they were all susceptible to failure.  Thereafter, RK removed and replaced all the Charlotte flanges with a different manufacturer's flanges that were of a different material configuration and composition.  The process of removing and replacing the Charlotte flanges included the removal and replacement of various building components in order to gain access to the Charlotte flanges.

Microbac Laboratories, Inc. prepared a report on behalf of RK concluding that the Flange Failure was due, in part, to an assembly or workmanship defect in addition to manufacturing defects in the flanges.  Higgins & Associates prepared a report on behalf of Travelers concluding that the flanges failed due to improper installation.  Plastic Failure Labs prepared a report on behalf of the flange manufacturer concluding that the flanges failed due to improper installation by RK.

On December 18, 2009, RK tendered a notice of claim and demand for indemnity to Travelers in connection with the costs to remove and replace the Charlotte flanges, including the two flanges involved in the Flange Failure (Notice & Claim).  Less than one month later, on

---

denies payment for the cracked flanges and the documentary evidence does not support a contention that Travelers paid for any damages other than that caused by water.

January 13, 2010, Travelers denied RK's claim based on Exclusions B.3.d and B.4.f of the

Policy.  RK brings suit for breach of insurance contract and declaratory relief.

## PROCEDURAL HISTORY

RK initially filed its complaint against Travelers in state court on August 26, 2010.  (Doc.

No. 1-3.)  Travelers removed the action to this Court on September 20, 2010.  (Doc. No. 1.)  The

parties agreed to a cross motions procedure to resolve the discreet insurance coverage dispute at

issue.  (Doc. No. 15 at ¶ F; Doc. No. 16.)  The parties filed cross motions for summary judgment

on April 15, 2011 (Doc. Nos. 21 and 22) and response briefs on May 13, 2011.  (Doc. Nos. 24

and 25).  No reply briefs were allowed.  The parties consented to this court's jurisdiction to

render a final resolution of these two motions pursuant to 28 U.S.C. § 636(c)(1).  (Doc. Nos. 18

and 19.)  The motions are ripe for review and ruling.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The moving party bears the initial burden of showing an absence of evidence to support the

nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving

party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for

trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518

(10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the

allegations in the pleadings, but must instead designate "specific facts showing that there is a

genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).  A disputed fact

4

is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. At the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

## ANALYSIS

Travelers removed this action from state court based on diversity jurisdiction. In a case removed to federal court based on diversity jurisdiction, the federal court applies the substantive law of the forum state. *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009). Interpretation of an insurance contract is a question of law for the court. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1059 (Colo. 2005). Colorado courts construe an insurance policy's terms according to principles of contract interpretation. *Berry & Murphy*, 586 F.3d at

5

808 (citing *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004)). The Colorado

Supreme Court has said:

> In interpreting a contract, we seek to give effect to the intent and reasonable expectations of the parties. Accordingly, unless the parties intend otherwise, terms in an insurance policy should be assigned their plain and ordinary meaning.
> We also recognize that unlike a negotiated contract, an insurance policy is often imposed on a "take-it-or-leave-it" basis. Therefore, we assume a "heightened responsibility" in reviewing insurance policy terms to ensure that they comply with public policy and principles of fairness. Accordingly, ambiguous terms in an insurance policy are construed against the insurer.

*Thompson*, 84 P.3d at 501-502. *See also Bangert Bros. Const. Co., Inc. v. Americas Ins. Co.*,

888 F. Supp. 1069, 1072 (D. Colo. 1995).

The issue in this case is whether RK is entitled to indemnity for the costs it incurred

investigating potential flange failure, removing and replacing cracked Charlotte flanges and,

ultimately, removing and replacing all Charlotte flanges with those of a different manufacturer.

RK posits several theories supporting its claim for coverage from Travelers.

**A.      *Waiver and Estoppel***

RK contends that by indemnifying Dunn and RK for the costs "associated with the

Flange Failure and water damage," Travelers has implicitly conceded that there is coverage

under the Policy for mitigation costs. (RK Mot. at 7.) RK claims that Travelers "indemnified its

insureds for removal and replacement of the cracked Charlotte Flanges *in addition to* the

damages the Project sustained as a result of the water damage" claiming that Travelers initially

paid to replace the two cracked flanges in the mechanical room. (*Id.*)

6

Travelers contends that it indemnified and reimbursed Dunn and RK for the costs resulting from the water damage caused by the Flange Failure, but that these costs did not include the cost to remove and replace any of the Charlotte Flanges at the Project, including the two flanges whose failure resulted in the water damage.  (Travelers' Resp. at 7-8.)  Travelers points to RK's Complaint, the invoices submitted by RK with its Notice & Claim, and Travelers' Denial Letter in support.

In the Complaint, RK asserts that it submitted a Mitigation Notice and two Contract Change Proposals (CCPs) to Travelers.  (Compl. at ¶¶ 20, 21.)  CCP-155.0 for "Belfor Restoration Service Invoices due to Water Damage" was for $24,115.00.  (Compl. at ¶ 21; Travelers Resp. at Ex. A-4.)  RK was paid for this invoice.  (Compl. at ¶ 22.)  The invoice does not reference any repair or replacement of any flanges or plumbing.  CCP-171.0 included three items: 1) Cracked and Failed Defective CPVC Flange Water Leak Incident of 6/16/2009, which included "Penthouse Mechanical Room CPVC Flange and Piping Repairs"; 2) Removal and Replacement of Cracked Defective CPVC Flanges; and 3) Removal and Replacement of Non-Cracked Defective CPVC Flanges.  (Travlers Resp. Ex. A-4.)  CCP-171.1 included a fourth item for J.E. Dunn CPVC Cost Reconciliation.  (*Id.*)  Together, CCP-171.0 and 171.1 totaled $438,525.00.  Travelers did not pay RK for any portion of these invoices.  (Compl. at ¶ 22.)

RK does not address the documentary evidence set forth above, apparently entirely basing its claim that Travelers paid to replace the two cracked flanges in the mechanical room on the parties' Stipulation of Undisputed Facts.  In Stipulation ¶ 12, the parties agree that "Travelers indemnified Dunn and RK for the costs associated with the Flange Failure and water damage.

Travelers did not provide coverage for any costs associated with RK's removal and replacement of all the Existing Flanges."  In Stipulation ¶ 6, the parties agree that "[o]n or about June 16, 2009, two of the Charlotte Flanges located in the Project's upper floor mechanical room cracked (the "Flange Failure").  Water overflowed from one of the cracked flanges, resulting in water damage to the Project."  Neither of these stipulated facts specifically state that Travelers' indemnification included the costs for the two cracked flanges.  In light of the undisputed invoice evidence, the court concludes that, while Travelers did indemnify and pay Dunn and RK for the loss resulting from the water damage due to the Flange Failure, Travelers did not pay either Dunn or RK for the removal and replacement of any of the Charlotte flanges, including the two flanges involved in the Flange Failure.  Accordingly, RK's waiver and estoppel arguments fail on the facts.

Moreover, in Colorado, "the doctrines of wavier and estoppel cannot create coverage where none exists under the policy."  *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 37 (Colo. App. 2004) (citing *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606 (Colo. 1999) and *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988)).  The Colorado Supreme Court has said:

> The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be distinguished from the waiver of, or estoppel to assert, grounds of forfeiture. Thus, while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage, or restrictions on the coverage, cannot be extended by the doctrine of waiver or estoppel. While it is true that if the insurer, with knowledge of facts which would bar an existing

> primary liability, recognizes such primary liability by treating the policy as in force, he will not thereafter be allowed to plead such facts to avoid his primary liability, the doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included or contemplated by its terms.

*Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962) (quoting 29A Am. Jur. Insurance § 1135).  Accordingly, even if Travelers had paid RK for replacement of the two cracked Charlotte flanges, the doctrines of waiver and estoppel would not create coverage for the replacement of all the other Charlotte flanges installed throughout the project if that coverage did not otherwise exist in the Policy.[2]

**B.      *Policy Coverage and Exclusions***

The Policy states that Travelers "will pay for 'loss' to Covered Property from any of the Covered Causes of Loss."  (Stipulation, ¶ 15.)[3]  Loss is defined as "accidental loss or damage."  (*Id.*)  Covered Cause of Loss is defined as "risks of direct physical 'loss' except those causes of 'loss' listed in the Exclusions."  (*Id.*)

RK contends that a "loss" resulting from a "covered cause of loss" has occurred and that either the Policy Exclusions do not apply or they are internally inconsistent, creating an ambiguity that must be construed in favor of RK.  (RK Mot. at 7, 14-18.)  Travelers insists that RK's costs to investigate, remove and replace the Charlotte flanges with those from a different

---

[2] RK relies on authority addressing an insurer's failure to timely assert an affirmative defense based on the actions or inactions of the insured that forfeited coverage.  (RK Mot. at 8.) Such authority does not support RK's argument made here but similar authority is discussed below with regard to the Policy's "sue and labor" clause.

[3] The policy in its entirety is found at Compl., Ex. A-1 (Doc. No. 1-3) at 9-53.

manufacturer are excluded under the Policy's exclusions for faulty workmanship and defective

materials.  (Travelers Mot. at 8-13.)

### 1.        Applicability of Exclusions

When an insurance company seeks to limit or exclude coverage under the terms of an

insurance policy, the insurer bears the burden of proving that a particular loss falls within an

exclusion in the contract. *Ark. Valley Drilling, Inc. v. Continental Western Ins. Co.*,

703 F. Supp. 2d 1232, 1238 (D. Colo. 2010), citing *Colo. Intergovernmental Risk Sharing

Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008).  Colorado courts have

approved clauses that exclude coverage for the costs of correcting defects.  *See, e.g., A.D. Irwin

Investments, Inc. v. Great Am. Ins. Co.*,  475 P.2d 633, 635 (Colo. App. 1970) (insurance

company did not become "a guarantor of perfect performance" concerning maintenance of air

conditioning system which caused damage.); *Bangert Bros. Const. Co.,* 888 F. Supp. at 1073.

However, under Colorado law, "exclusionary clauses designed to insulate particular conduct

from general liability coverage provisions must be drafted in clear and specific language." *Am.

Family Mut. Ins. Co. v. Johnson*, 816 P.2d 952, 953 (Colo. 1991).  The insurer bears the burden

of showing that an exemption applies in a particular case and the exclusion is not subject to any

other reasonable interpretation.  *Id.*  If the insurer shows that the exclusion applies, the burden

shifts back to the insured to prove the applicability of an exception to the exclusion.  *Rodriguez

ex. rel. Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991) (citing *Watkins

v. Sec. Benefit Ass'n*, 255 P. 452 (1927)).

The Policy provides coverage for any loss due to a "covered cause of loss."  While a "covered cause of loss" includes the *risk* of of loss, not just an actual loss, the plain language exempts from the definition of "covered cause of loss" "those causes of 'loss' listed in the exclusions."  (Stipulation, ¶ 15.)  Faulty, inadequate and defective materials, workmanship and maintenance are all causes of loss listed in the Exclusions and therefore cannot be read to be "covered cause(s) of loss."

Exclusion B.3 states:

> 3.  We will not pay for 'loss' caused by or resulting from any of the following.  But if 'loss' by a Covered Cause of Loss results, we will pay for the resulting 'loss.'[4]
>
> ***
>
> d.  Omission in, or faulty, inadequate or defective:
>     (1)  Planning, zoning, development, surveying, siting, design or specifications; or
>     (2)  Materials, workmanship or maintenance.
>
> ***

(Stipulation, ¶ 16.)  Given this clear and unambiguous language, the cracked and potentially defective Charlotte flanges are not "covered cause(s) of loss."

## 2.  Ensuing Loss Provision

It is not disputed that the costs to remediate and repair covered property damaged by the water which escaped the plumbing system when the Charlotte flanges cracked, falls within the

---

[4] Travelers refers to this second sentence in Exclusion B.3 as the "ensuing loss provision."  (*See* Travelers Mot. at 9 n.2.)

ensuing loss provision of the policy.[5]  Travelers reimbursed funds to indemnify for this loss to RK as part of the ensuing loss provision.  Pursuant to that same provision, RK contends that each of the remaining Charlotte flanges posed a "risk of direct physical loss" because each was at risk of failing and, when they did fail, they would contribute to or cause pipes to break that would result in more water damage to the Project, a covered loss under the ensuing loss provision.  (RK Mot. at 15.)  RK argues, then, that the replacement of the flanges was therefore a "covered cause of loss" because the water damage is not a loss listed in the exclusions.

An ensuing loss clause, however, "does not reinsert coverage for excluded losses, but rather reaffirms coverage for secondary losses ultimately caused by excluded perils."  *Cooper v. Am. Family Mut. Ins. Co.*, 184 F. Supp. 2d 960, 964 (D. Ariz. 2002).  The cost of making good on faulty work or defective products is not contemplated nor covered by the policy at issue since this kind of loss is specifically excluded. *See, e.g.*,  *Bangert Bros. Const. Co.*, 888 F. Supp. at 1073 (citing *Allianz Ins. Co. v. Impero*, 654 F.Supp. 16, 18 (E.D. Wash. 1986) (contractor not allowed to recover under all-risk policy for cost of making good faulty concrete work.)  As in *Bangert*, if this Court were to ignore the nature of the policy and its exclusions in order to allow coverage, the result would be to "turn these policies into something they are not: performance bonds or guarantees of contractual work."  *Id.*; *See also Hartford Acc. & Indem. v. Pacific Mut. Life Ins.*, 861 F.2d 250, 253 (10th Cir.1988); *Gerrity Co. v. CIGNA Property & Cas. Ins.*, 860 P.2d 606, 609 (Colo. App. 1993).

---

[5] Travelers paid CCP-155.0 for restoration due to water damage presumably pursuant to the ensuing loss provision in the policy.

In construing an insurance policy, "words should be given their plain meaning according to common usage and strained constructions should be avoided." *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1994) (internal citations omitted).  A "determination of an insurance contract's meaning . . . is not answered by reference to what those who are experts in the construction of insurance contracts or those with a clear understanding of the legal effects of specific language might understand by reading a policy." *Simon v. Shelter Gen. Ins. Co.*, 842 P.2d 236, 240 (Colo. 1992).  To the contrary, the construction "must be ascertained by reference to what meaning a person of ordinary intelligence would attach to it." *Id.*

The court finds RK's circular reading of the ensuing loss provision to be strained.  Such an interpretation would render meaningless any exclusions since all the excluded items would ultimately be covered losses if there was damage to the property for which indemnity was allowed because of an ensuing loss.  An ensuing loss provision does not cover loss caused by the excluded peril; it covers loss caused to the property wholly separate from the defective property itself, in this case the escaping water, not the cracked flange.  *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 139 F. Supp. 2d 1374, 1383 (S.D. Fla. 2001).  *See also Laquila Constr., Inc. v. Travelers Indem. Co.*, 66 F. Supp. 2d 543, 544-45 (S.D.N.Y. 1999) (Faulty concrete resulted in floor in multi-story building being demolished and replaced; court recognized that had floor collapsed and damaged machinery or other property such losses would have been covered as ensuing loss, but since the loss had not occurred there was no coverage under policy that excluded defective workmanship or materials.)  The costs of correcting defects does not constitute "loss" under the ensuing loss provision.  *Laquila,* 66 F. Supp. 2d at 544-45.  In arguing

that the defective flanges constitute a "covered cause of loss" because they pose a "risk of direct physical loss" because of potential ensuing water damage, RK ignores the second part of the definition "*except those causes of 'loss' listed in the Exclusions*."  (Stipulation, ¶ 15 (emphasis added).)  Faulty workmanship and defective materials are listed in the Exclusions to the Policy. Therefore, a plain reading of the ensuing loss policy provision requires a finding that replacement of the faulty flanges is not "a covered cause of loss."

### 3.      Internal Conflict Between Exclusions

RK also argues that Exclusion 4.f is in direct conflict with Exclusion 3.d and such internal inconsistency creates an ambiguity in the Policy that must be construed against the insurer.  (RK Mot. at 16-18 (discussing *Simon*, 842 P.2d at 240).)  RK notes that "Exclusion 3.d purports to exclude coverage for 'loss' caused by or resulting from faulty or defective materials or workmanship, [while] the exception to that exclusion restores such coverages to the extent a loss from a 'risk of loss' results."[6]  (*Id.* at 17.)  RK contends that "Exclusion 4.f attempts to exclude coverage for business costs occurring after a 'loss' resulting from the construction or repair of property" and thus, Exclusion 4.f "purports to exclude the very coverage that was restored by the exception to Exclusion 3.d."  (*Id.*)

Exclusion B.4 states:

> 4.      We will not pay the 'amount of loss' that is directly or indirectly due to an increase in the 'post-loss period of construction' caused by any of the  following.  Such 'amount of loss' is excluded

---

[6] The court reads this to be a reference to the ensuing loss provision.

> regardless of any other cause or event that contributes concurrently or in any sequent to the following:
>
> ***
>
> f.        Deficiencies in the original designs, specifications, materials, or construction;
>
> ***

(Stipulation, ¶ 16.)

The policy states "amount of loss is defined as "the sum of your actual 'soft costs,' as covered by this policy.  (Stipulation, ¶ 17.)  Soft costs are "your actual and necessary business costs in excess of your budgeted amount for the 'project' consisting only of type shown in the declarations."  (*Id.*)  "Post-loss period of construction means the period of time that a) begins with the 'planned completion date'; and b) ends on the date when the 'project' should be completed using reasonable speed and similar materials and workmanship."  (*Id.* ¶ 18.)

Thus, Exclusion 4.f provides that Travelers will not pay RK's actual and necessary business costs in excess of the budgeted amount that arise from an increase in the post-loss period of construction caused by deficiencies in the original designs, specifications, materials, or construction.

*Simon*, the case relied on by RK, involved a general liability insurance policy providing coverage for bodily injury and property damage.  842 P.2d at 238.  The policy excluded coverage for contractual liability but an exception to this exclusion restored coverage for warranties of fitness, quality and workmanlike performance.  *Id.*  The policy also contained endorsements for products hazards and completed operations hazards which themselves excluded coverage for damage arising from reliance on a warranty.  *Id.* at 238-39.  The Colorado Supreme Court noted

a clear conflict between the exception for warranties of fitness, quality, and workmanlike performance in the general grant of coverage and the exclusion for damage arising from reliance on a warranty in the endorsements. *Id.* at 240.  The Colorado Supreme Court held that such conflict must be construed against the insurer in favor of coverage. *Id.* at 241.

The court does not find such an internal conflict in the Policy in this case.  In fact, the court does not see any inconsistency between Exclusion 3.d and Exclusion 4.f.  While Exclusion 3.d. excludes loss to a property resulting from faulty workmanship or defective materials, Exclusion 4.f excludes increases in actual and necessary business costs associated with losses caused by deficient design, specifications, materials or construction.  The two exclusions address different types of losses that may result from faulty workmanship or defective materials and therefore are not in conflict.  Moreover, Exclusion 4.f does not exclude coverage which is restored by the ensuing loss provision of Exclusion 3.d because, as described in the preceding section, the ensuing loss provision does not restore coverage for losses that result from faulty work or defective materials.  Accordingly, there is no internal inconsistency that must be construed in favor of coverage.

**C.**     ***Duty to Mitigate***

RK also argues that it was obliged both under the terms of the Policy and at common law to mitigate losses and, therefore, Travelers must indemnify RK for its mitigation costs.

**1.**     **Contractual Duty to Mitigate**

RK contends that the Policy required RK to "take all reasonable steps to protect the Covered Property from further damage, . . . ." (RK Mot. at 9.)  The Policy provides:

16

C.      Duties in the Event of Loss

You must see that the following are done in the event of loss or damage to Covered Property:

\*\*\*

4.      Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  *However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.*  Also, if feasible, set the damaged property aside and in the best possible order for examination.

\*\*\*

(Stipulation, ¶ 19 (emphasis added).)  The parties treat this provision as a "sue and labor" clause.  (*See* Travelers Mot. at 13; RK Resp. at 1.)  They agree that no Colorado court has had occasion to construe a sue and labor clause or similar provision in an insurance contract.  (Travelers Mot. at 14; RK Resp. at 5 n.2.)  The court also is aware of no Colorado case law dealing with the issue.  When there is no case law from the forum state directly on point, the federal court "must determine what decision the state court would make if faced with the same facts and issue."  *Phillips v. State Farm Mut. Auto. Ins. Co.*, 73 F.3d 1535, 1537 (10th Cir. 1996).  In doing this, the court may consider a number of authorities, including analogous decisions by the highest appellate court in the forum state, the decisions of lower state courts in the forum state, the decisions of federal courts and other state courts, and "the general weight and trend of authority."  *Id.* (internal quotations and citations omitted).

As the California Supreme Court has explained:

The 'sue and labor' clause appearing in most marine and inland marine insurance policies is of ancient lineage, its forebears extending back—according to a leading case on the subject—at least into the seventeenth century. (*Reliance Insurance Company v. The Escapade* (5th Cir. 1960) 280 F.2d 482, 488-489, fn. 11.) Such a clause makes express the duty implied in law on the part of the insured to labor for the recovery and restitution of damaged or detained property (WINTER, MARINE INSURANCE (3d ed. 1952), p. 393) and it contemplates a correlative duty of reimbursement separate from and supplementary to the basic insurance contract. 'Its purpose is to encourage and bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss. Under this clause the assured recovers the whole of the sue and labor expense which he has incurred . . . and without regard to the amount of the loss or whether there has been a loss or whether there is salvage, and even though the underwriter may have paid a total loss under the main policy.' (*White Star S.S. Co. v. North British & Merc. Ins. Co.* (E.D. Mich. 1943) 48 F.Supp. 808, 813; see *Reliance Insurance Company v. The Escapade, Supra*, 280 F.2d 482, 488-489, fn. 11; 15 COUCH ON INSURANCE, 2D (1966) § 55:123, p. 552; VANCE ON INSURANCE (2d ed. 1930) § 255, pp. 864-865.)

There is, however, a fundamental limitation upon the insurer's duty under a 'sue and labor' clause to compensate the insured for expenses incurred in the preservation and protection of insured property: the expenses in question must be incurred to preserve the insured property from a peril insured against under the basic policy. 'Since an assured has the duty toward his underwriter to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy, the clause undertakes to reimburse the assured for these expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether. . . .  (Par.) Taking the analysis through the next step, it is obvious that since the clause is to reimburse the assured for expenses incurred in satisfying the assured's duty to the underwriter, there is no such duty where the policy, for one reason or another . . . does not apply. . . .  The obligation comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable. If the underwriter would not be liable at all . . . there would be no contractual obligation to repay sue and labor.' (Fn. omitted; italics added.) (*Reliance Insurance Company v. The Escapade, Supra*, 280 F.2d 482, 488-489; *see also Home Ins. Co. v. Ciconett* (6th Cir. 1950) 179 F.2d 892, 895; *White Star S.S. Co. v. North British & Merc. Ins. Co., Supra*, 48 F. Supp. 808, 812-813; *Berns & Koppstein, Inc. v. Orion Insurance Co.* (S.D.N.Y. 1959) 170 F. Supp. 707, 719; 15 COUCH ON

INSURANCE 2D (1966) § 55:125, pp. 552-553; VANCE INSURANCE (2d ed. 1930) § 255, pp. 864-865.

*Young's Mkt. Co. v. Am. Home Assur. Co.*, 481 P.2d 817, 820 (Cal. 1971).  Professor Vance has further elaborated,

> The loss or damage which the insured labors to avoid must be such that it would be chargeable to the insurer if it should occur. The purpose of the clause is not to stimulate philanthropic heroism, but to lessen the loss for which the underwriter would be liable. The insurer is certainly not commercially interested in securing protection of the venture against a misfortune for which he had declined to assume responsibility.

VANCE INSURANCE at 865.

The great weight of authority from other jurisdictions holds that an insured's ability to recover mitigation costs under a sue and labor cause is tied to the insurer's obligations under the general insuring provisions of the policy.  In an early case dealing with recovery under a sue and labor clause, the United States Supreme Court said,

> If this clause be construed with reference to what is most evidently its subject-matter, that is *a loss within the policy*, and in connection with other parts of the instrument, it seems impossible to misunderstand it, or that it should receive so extensive an application as the plaintiff is desirous of giving to it. The parties certainly meant to apply it only to the case of those losses or injuries for which the insurers, if they had happened, would have been responsible. Having, in such cases only, an interest in rescuing or relieving the property, it is reasonable, that then only they should defray the charges incurred by an effort made for that purpose; but when a loss takes place, which cannot be thrown on them, it would require a much stronger and more explicit stipulation than we find in the policy, to render them liable to contribute to such expenses.

*Biays v. Chesapeake Ins. Co.*, 11 U.S. (7 Cranch.) 415, 419 (1813) (emphasis in original).  Other federal and state cases have held the same.  *See, e.g.*, *Reliance*, 280 F.2d at 489 ("The underwriter has no right to demand that the assured take the sue and labor steps unless the policy

is applicable."); *John S. Clark Co., Inc. v. United Nat'l Ins. Co.*, 304 F. Supp. 2d 758, 767 (M.D.

N.C. 2004) ("[A] sue and labor clause does not extend or create coverage; the recovery . . . is

tied irrevocably to the obligations undertaken by the insurers in the basic insurance policy.");

*Swire,* 139 F. Supp. 2d at 1383 ("Whether sue and labor expenses are covered at all . . . is tied

directly to the policy's insuring provisions."); *S. Cal. Edison Co. v. Harbor Ins. Co.*, 83 Cal.

App. 3d 747, 758, 148 Cal. Rptr. 106 (Cal. Ct. App. 1978) ("[R]ecovery under a sue and labor

clause is tied irrevocably to the obligations undertaken by the insurer in the basic insurance

policy."); *Young's Mkt.*, 481 P.2d at 820.

 The court has already concluded that losses caused by faulty workmanship or defective

materials are excluded under the policy and that losses suffered to repair or replace such

defective materials or fix such faulty workmanship do not magically become "covered causes of

loss" solely by virtue of an ensuing loss provision.  The claim by RK is essentially one of taking

"remedial measures" given their assessed probability that the Charlotte flanges would crack and

leak, causing further water damage to the property.  The plain language of the sue and labor

clause, however, reiterates that Travelers will not pay for subsequent loss or damage "resulting

from a cause of loss that is not a <u>Covered Cause of Loss</u>."  (Stipulation, ¶ 19.)  Accordingly,

although the Policy requires an insured, in the event of loss or damage, to take all reasonable

steps to protect Covered Property from further damage, it clearly provides that Travelers will not

pay for loss or damage due to an excluded cause of loss.[7]  *See John S. Clark* at 768 (means used

---

[7] RK also suggests that the Policy's "cooperation clause" imposes a duty to mitigate.  It
provides:

to mitigate damages were excluded under the policy and therefore not recoverable under sue and labor clause); *Swire* at 1385(same); *Edison* at 758 (same); *Nat'l Hous. Bldg. Corp. v. Acordia of Va. Ins. Agency, Inc.*, 591 S.E.2d 88, 253 (Va. 2004) (policy did not permit the plaintiff "to circumvent the exclusion from coverage" by recovering remediation expenses under a sue and labor clause).

In effect, RK attempts to bootstrap its remediation expenses to correct its own substandard workmanship and use of defective products in the Project into a covered claim through the "Duties in the Event of Loss" provision, despite the clear exclusion from coverage for loss caused by "faulty, inadequate or defective . . . [m]aterials, workmanship or maintenance."  (Policy, Compl., Ex. A-1, Exclusions, Section 3.d.)  Although there was a "risk of loss" from flanges cracking it was not a loss attributable to a "covered cause of loss" and therefore did not give rise to a duty to mitigate.

RK asserts that coverage under the sue and labor clause is distinct from coverage under the basic insurance policy.  (RK Resp. at 4.)  To the extent RK is arguing that the sue and labor clause provides supplemental coverage and is not subject to the exclusions in the general policy, its argument fails.  "Although certain cases have referred to a Sue and Labor provision as a

---

       C.      Duties in the Event of Loss
           You must see that the following are done in the event of loss or damage to Covered Property:
                ***
          10.     Cooperate with [Travelers] in the investigation or settlement of the claim.
(Doc. No. 20, Commercial Inland Marine Conditions, ¶ C.10.)  The court finds no basis to infer a duty to mitigate from this provision.

'separate' insurance provision, *see, e.g.*, *White Star S.S. Co. v. North British & Mercantile Ins. Co.*, 48 F. Supp. 808, 812-13 (E.D. Mich. 1943), it is separate only in the sense that the insured's losses are not subject to deductibles or to the limits of liability set forth in the policy." *Swire*, 139 F. Supp. 2d at 1383; *see also Am. Home Assur. Co. v. J. F. Shea Co., Inc.*, 445 F. Supp. 365, 369 (D.C. D.C. 1978); *cf. Reliance*, 280 F.2d at 488 (rejecting this type of argument based on the history, function and purpose of the sue and labor clause).

Moreover, the terms of the instant policy make clear that the sue and labor clause is not a separate insuring agreement.  The sue and labor clause is found in ¶ 4 of Section C of the Commercial Inland Marine Conditions.  (*See* Doc. No. 20, Commercial Inland Marine Conditions, ¶ C.4.)  The Commercial Inland Marine Conditions state: "The following conditions apply in addition to the Common Policy Conditions and applicable Additional Conditions in Commercial Inland Marine Coverage Forms:." (*Id.* Commercial Inland Marine Conditions.)  The sue and labor clause is not contained within the "coverage section" nor does it contain any standard insuring agreement language.  By its terms, the sue and labor clause is simply a condition of coverage which must be read in conjunction with the Common Policy Conditions and the Commercial Inland Marine Coverage Forms.  *See Swire* at 1383 (same).

RK distinguishes between cases involving the recovery of costs of prevention, as opposed to mitigation costs under a sue and labor clause.  RK contends that its expenses were incurred in mitigation of further losses to the Project, not prevention of future losses.  Nevertheless, RK maintains that a covered loss does not have to occur before the sue and labor clause requires indemnification.  (*See* RK Resp. at 5 (discussing *Wolstein v. Yorkshire Ins. Co.*,

22

*Ltd.*, 985 P.2d 400 (Wash. App. Div. 1, 1999)); *but see* RK Resp. at 10 (acknowledging case law holding that a covered loss is a condition precedent to any compensation under a sue and labor provision).)

The court need not address this distinction because, regardless of whether costs were incurred to minimize further loss or to prevent future loss, the law is clear that costs must relate to a *covered cause of loss*. RK's request for indemnification fails because the means it used to address a problem that was excluded from coverage that could have <u>led</u> to a covered loss (i.e., water damage) via the ensuing loss provision, were excluded under the policy.

In *Edison*, 83 Cal. App. 3d 747, prior to the commencement of commercial operations, the foundations of two newly constructed buildings began to settle differentially due to faulty foundation design. *Id.* at 751, 755. Plaintiff undertook mudjacking operations to raise the foundations to their initial level to prevent damage to the superstructure. *Id.* The insurer denied a claim for indemnification under a sue and labor clause similar to the one here based on an exclusion for the "cost of making good faulty workmanship, construction or design." *Id.* at 750. The exclusion did not apply "to damage resulting from such faulty workmenship, [sic] construction or design." *Id.* (error in policy). The California Court of Appeals held that damage to the superstructure, if it had occurred, would have been an insurable loss. *Id.* at 755-56. However, the court determined that the means and methods the Plaintiff used "to prevent or mitigate such damages were excluded under the policy" because they corrected design defects. *Id.* at 758-69. Although "mudjacking may have prevented or mitigated loss to the superstructure

23

. . . the costs of mudjacking were not primarily for the benefit of the insurers.  The benefit incurring to the insurers was only incidental." *Id.* at 760.

The Southern District of Florida was persuaded by *Edison*'s reasoning in another similar case.  In *Swire*, the plaintiff demolished portions of a finished building in order to access and repair defectively designed portions of the building.  139 F. Supp. 2d at 1377.  The insurer refused to indemnify based on an exclusion for losses incurred to correct a design defect.  *Id.* Relying on *Edison*, the Florida district court noted that "a court looks not to whether the insured's actions may potentially benefit the insurer in some way, but rather, whether the actions correlate to an excluded loss (in which case the sue and labor expenses do not benefit the insurer because the loss would not be covered) or correlate to a covered loss  (in which case the  actions benefit the insurer by reducing or eliminating the loss for which the  insurer would be liable).  *Id.* at 1385.  The court concluded that, although the plaintiff's expenditures to remedy the design defect may have had an incidental benefit to the insurer by possibly preventing the collapse of the building at some unknown point in the future, those expenditures were made directly and primarily to correct design defects in the building, which were excluded expenses under the terms of the policy.  *Id.*

*John S. Clark* also involved a construction project.  Portions of the construction project collapsed due to strong winds and poor construction.  304 F. Supp. 2d at 762.  Other portions sustained damage due to faulty workmanship.  *Id.* at 762-63.  The plaintiff sought reimbursement for the costs to cleanup and reconstruct the collapsed portions of the construction project as well as the costs to repair other defectively built portions of the project and to correct its own faulty

workmanship. *Id.* at 763.  The insurer reimbursed the plaintiff for the costs related to the collapse due to strong winds and poor construction, but denied the costs to repair defectively built portions that suffered no wind damage and to correct faulty workmanship. *Id.*  The court found that the costs due to faulty workmanship or negligent construction were not covered by the insuring agreement and therefore were not covered by the sue and labor provision. *Id.* at 766-768 (discussing *Edison* and *Swire*.)

The policy provisions in *Nat'l Housing Bldg. Corp.,* 591 S.E.2d 88, were nearly identical to the provisions in the present case.[8]  In *Nat'l Housing*, a construction project was built on a steep slope requiring multiple retaining walls. *Id.* at 90.  Due to structural concerns regarding the lowest wall, which supported the other walls and foundations of the uphill apartment buildings, the plaintiff instituted remedial measures and eventually replaced the first wall. *Id.*  The plaintiff also instituted remedial measures to underpin the foundations of the uphill buildings so as to prevent any loss or damage. *Id.*  The parties did not dispute that all the

---

[8] The policy provided coverage "for 'loss' to Covered Property from any of the Covered Causes of Loss." *Nat'l Housing* at 91.  "Covered Causes of Loss" was defined as "Risks of Direct Physical 'Loss' to Covered Property *except those causes of 'loss' listed in the exclusion.*" *Id.* (emphasis added by the Virginia court).  The policy also contained a provision for "duties in the event of loss" which provided that the insured must

> take all reasonable steps to protect the Covered Property from further damage and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim.  This will not increase the Limit of Insurance.  However, we will not pay for the subsequent 'loss' resulting from a cause of loss that is not a Covered Cause of Loss.

*Id.*  Further, an ensuing loss provision read: "We will not pay for a 'loss' caused by or resulting from any of the following: e) Defective materials or poor workmanship, error, omission or deficiency in designs, plans or specifications.  This exclusion does not apply to resultant "loss" to other Covered Property." *Id.*

remediation expenses were based on the defective design of the lower wall.  *Id.* at 91.  The

Virginia court determined that the remediation expenses were not subject to indemnification

because they resulted from a cause of loss that is not a covered cause of loss and the policy

"[did] not permit [the plaintiff] to circumvent the exclusion from coverage in this manner and

recoup its remediation expenses."  *Id.* at 92 (citing *Edison*, 83 Cal. App. 3d at 759-760).

The court concludes, based on the great weight of authority from other jurisdictions, that

Colorado courts would hold that an insured's ability to recover mitigation costs under a sue and

labor clause is tied to the general insuring provisions of the policy.  Because RK's actions to

remove and replace the defective flanges corrected faulty workmanship and/or defective

materials they "correlated to an excluded loss" and any benefit incurring to Travelers was

incidental.  The court therefore concludes that RK is not entitled to indemnification for

mitigation costs under the sue and labor clause.

### 2.      Waiver/Estoppel Regarding Mitigation

RK claims that Travelers was made aware of the purported basis for denying coverage on

June 17, 2009, but "stood silent as RK expended large sums of money" to remove and replace

the Existing Charlotte Flanges" and that by taking a position reflecting continuing coverage,

Travelers waived or is estopped from denying indemnity under the sue and labor provision.  (RK

Resp. at 9.)  In *Reliance*, a private yacht that had been chartered for a week's voyage, in

violation of a private use warranty in the insurance agreement, ran aground in the Bahamas.  *Id.*

at 484.  The insurer, aware of the breach of warranty, directed the yacht owner to undertake

salvage operations or face forfeiture of the policy.  *Id.* at 485.  Thereafter, the insurer continued

to direct the salvage operations.  *Id.* at 485-86.  The insurer eventually refused to indemnify the

owner for the salvage operations based on the breach of private use warranty.  *Id.* at 484.  The

Fifth Circuit found that the insurer was estopped from asserting the private use warranty as it

"stood silent while at the same time asserting the imperative demands that the Assured take these

costly actions or run the risk that he would have no insurance."  *Id.* at 490.  In response to the

insurer's argument that estoppel cannot be applied to extend coverage, the circuit found that the

policy expressly covered "damage from perils of the seas." *Id.* at 487.  Because "an assured has

the duty toward his underwriter to . . . protect insured property in order to minimize or prevent

the loss from the occurrence for which the underwriter would be liable under the policy," *id.* at

488, the salvage costs were recoverable, *id.* at 490.

RK asserts that Traveler's was aware that RK was undertaking expenses to correct a

defect, the basis it later provided in denying coverage, yet stood silent while RK expended large

sums of money to remove and replace the defective flanges.  (RK Resp. at 9.)  The parties'

Stipulation of Undisputed Facts indicates that Dunn notified Travelers of the Flange Failure and

ensuing water damage on June 17, 2009.  (Stipulation, ¶ 7.)  The parties also agree that RK

removed and replaced all the Charlotte Flanges based on its belief that they were susceptible to

failure, and that this process included removal and replacement of various building components

in order to gain access to the Charlotte Flanges.  (Stipulation, ¶ 7.)  RK tendered its Notice &

Claim on December 18, 2009.  (Stipulation, ¶ 13.)  However, there is no evidence before the

court that Travelers was aware of RK's remediation efforts with respect to the existing Charlotte

flanges, nor any suggestion that Travelers directed RK to take such efforts or made any other

27

demands to suggest continued coverage.  The Project was new construction and, as a subcontractor, RK likely had duties of its own to Dunn and others regarding its workmanship on the Project.  Accordingly, the court concludes that Travelers is not estopped by its actions from refusing to indemnify RK under the sue and labor clause.

Moreover, even if waiver or estoppel applied, it would not change the results on the facts of this case.  In *Reliance*, the Fifth Circuit found coverage under the policy for the mitigation costs the yacht's owner incurred.  In contrast here, the court has already determined that RK's expenses to address faulty workmanship or defective materials are excluded under the policy. Accordingly, applying estoppel in the manner that RK suggests would impermissibly supply coverage were not existed.  *Mgmt. Specialists, Inc. v. Northfield Ins. Co.*, 117 P3d 32, 37 (Colo. App. 2004).

### 3.     Common Law Duty to Mitigate

In addition to the contractual language, RK argues that it had a common law duty to mitigate because "[i]t is well-settled law in Colorado that an injured party may not recover damages for injuries which could reasonably have been avoided."  (RK Mot. at 10 (citing *Fair v. Red Lion Inn*, 943 P.2d 431, 437 (Colo. 1997)).)  RK asserts that the corollary to this rule is that a plaintiff is entitled to compensation for expenditures made in attempting to mitigate damages. (*Id.* (citing *Tull v. Gundersons, Inc.*, 709 P.2d 940, 946 (Colo. 1985)).)

In Colorado, the common law duty to mitigate damages arises from a breach.  *See Fair*, 943 P.2d at 437 (holding that employee had duty to mitigate damages following breach of employment contract by accepting offer of reinstatement); *Tull*, 709 P.2d at 946 (holding that

plaintiff was entitled to compensation for efforts to mitigate damages by finding other work

following breach of construction contract); *Technical Computer Servs., Inc. v. Buckley*, 844 P.2d

1249, 1255 (Colo. App. 1992) (holding evidence of money earned from another employer was

proper to reduce damage from breach of employment contract); *see also Ballow v. PHICO Ins.

Co.*, 878 P.2d 672, 680 (Colo. 1994) (noting general rule that an "injured party has the duty to

take such steps as are reasonable under the circumstances in order to mitigate or minimize the

damages sustained").  The measure of damages for a breach of contract is the amount it takes to

place the plaintiff in the position it would have occupied had the breach not occurred, taking into

account the plaintiff's duty to mitigate damages.  *Schneiker v. Gordon*, 732 P.2d 603, 612 (Colo.

1987).  In this case, RK incurred what it calls "mitigation costs" prior to any breach.  In fact,

Travelers refusal to reimburse RK for those costs already incurred is the basis for RK's breach of

insurance contract claim.  Accordingly, the facts of this case do not give rise to the common law

duty to mitigate.

RK suggests that, in *Ballow*, the Colorado Supreme Court recognized the potential

applicability of the common law duty to mitigate to insurance contract claims like the one in this

case.  In *Ballow*, 105 doctors sued their insurance carrier, PHICO, for breach of contract when it

refused to renew the doctors' medical malpractice insurance.  878 P.2d at 676.  On appeal, the

doctors argued that the trial court erred in not awarding the costs of defending and settling

certain malpractice claims against two doctors who had not purchased special additional

coverage to protect against claims made after the PHILCO malpractice policy terminated.  *Id.* at

676 n.2, 680.  PHICO argued that, by not purchasing such insurance coverage, the doctors failed

to mitigate their damages.  *Id.* at 680.  The Colorado Supreme Court noted that an injured party generally may not recover damages for injuries which he or she reasonably might have avoided, thus suggesting that the two doctors had a duty to purchase additional coverage in anticipation of a potential breach by PHICO.  However, because mitigation is an affirmative defense which the defendant has the burden of establishing, and because PHICO had abandoned the mitigation defense, the court did not analyze the mitigation issue and found that the two doctors were entitled to the cost of defending and settling those malpractice claims.  *Id.* at 680-81.  Notably, the cases cited by the Colorado Supreme Court involve an injured party's duty to mitigate costs <u>after</u> a breach has occurred.  *See Tull*, 709 P.2d at 946; *Valley Dev. Co. v. Weeks*, 364 P.2d 730, 733 (1961); *Technical Computer Servs.*, 844 P.2d at 1255.

Even if *Ballow* can be read as recognizing a duty to mitigate in anticipation of a breach, the court finds the facts of *Ballow* distinguishable from the case at hand.  There, by obtaining additional coverage the doctors would have protected themselves against a potential breach by PHICO.  Here, the mitigation costs expended by RK were not incurred in an effort to avoid damages from a potential breach of contract by Travelers.  To the contrary, it is precisely Travelers' refusal to indemnify RK for the costs  already expended of replacing the defective flanges that is the basis for RK's claim of breach.  To present an analogous situation, the doctors in *Ballow* would have had to purchase additional coverage prior to PHICO's nonrenewal and then sue PHICO for a breach of contract *related to the additional coverage.*  Accordingly, the court concludes that Colorado has not recognized a common law duty to mitigate on the facts of this case.

### 4.      Conflict between Exclusions and Mitigation Clause

RK also argues that Exclusions B.3.d and B.4.f conflict with RK's duties in the event of a loss, under the mitigation clause.  As previously described, Exclusions B.3.d and B.4.f exclude coverage for different types of losses that may result from faulty workmanship or defective materials.  While the mitigation clause requires an insured to take reasonable steps to protect Covered Property from further damage, it specifically excludes coverage for "loss or damage resulting from a cause of loss that is not a Covered Cause of Loss."  Because loss due to faulty workmanship or defective materials is not a covered cause of loss, the Exclusions do not conflict with RK's duties in the event of a loss and in fact are consistent with the exclusion found in the mitigation clause itself for "loss or damage resulting form a cause of loss that is not a Covered Cause of Loss."

**D.      *Public Policy***

Finally, RK appeals to public policy.  RK notes the court's responsibility to "review insurance contracts and ensure that they comply with public policy and principles of fairness." *Thompson*, 84 P.3d at 501-02.  RK claims that Travelers' construction of the sue and labor clause provides no incentive for insureds to proactively prevent additional covered losses to insured property, when such efforts involve addressing alleged defects in materials or workmanship.  (RK Resp. at 15.)  RK suggests that the effect of such a construction is contrary to public policy prohibiting illusory insurance coverage that allows the insurer to receive premiums without incurring any risk of liability.  (*Id.* at 16.)

It is well established that, provided no public policy is violated, an insurer has a right to decide which risks it will and which it will not insure against. *Nat'l Union Fire Ins. Co. of Penn. v. Carib Aviation, Inc*., 759 F.2d 873, 876 (11th Cir.1985).  A sue and labor clause "represents a specific, material provision of the insurance policy that imposes its distinct obligations upon the insured, separate and apart from any other express or implied duty that may arise by operation of law." *Am. Home Assur. Co. v. Merck & Co., Inc*.  386 F. Supp. 2d 501, 517 -518 (S.D.N.Y. 2005).  If RK had failed to comply with its obligations under that clause, it would be in breach of its obligations under the Policy as well as to any other contractual provisions it may have had with Dunn or others in connection with its work as a subcontractor.

The court finds RK's policy considerations inapplicable to the facts of this case.  First, presumably, an insured's potential liability to third parties outside the insurance contract context provides powerful incentive to identify, investigate, and correct defects in materials and workmanship.  Travelers simply did not agree to warrant RK's work.  It is undisputed that RK was the subcontractor in charge of plumbing on the project.  RK selected the plumbing products and installed them in the building.  Just as in *Edison,* 83 Cal.App.3d at 760, RK's replacement of the defective or incorrectly installed Charlotte flanges was RK's responsibility and therefore the costs of investigation and remediation inured primarily to RK and not to Travelers because neither defective products nor poor workmanship was a covered cause of loss.  See also *Young's Mkt.*, 481 P.2d at 820 ("There is, however, a fundamental limitation upon the insurer's duty under a 'sue and labor' clause to compensate the insured for expenses incurred in the

preservation and protection of insured property: the expenses in question must be incurred to preserve the insured property from a peril insured against under the basic policy.").

Further, the clause is not illusory as Travelers would face liability for expenses incurred under the sue and labor clause, if those expenses had not been " loss or damage resulting from a cause of loss that is not a Covered Cause of Loss."  (Stipulation, ¶ 19.)

Wherefore, for the reasons set forth herein, it is ORDERED

1.      Defendant's Motion for Summary Judgment (Doc. No. 21) is GRANTED;

2.      Plaintiff's Motion and Brief in Support of Motion for Summary Judgment Pursuant to C.R.C.P. 56 (Doc. No. 22) is DENIED;

3.      The Clerk of Court shall enter judgment in favor of Defendant; and

4.      Defendant may have its costs by filing a bill of costs pursuant to D.C.COLO.LCivR 54.1.

Dated this 1st day of August, 2011.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge